UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| TAMPA BAY WATERKEEPER, OUR CHILDREN'S EARTH FOUNDATION and SUNCOAST WATERKEEPER,<br><br>Plaintiffs,<br><br>     v.<br><br>CITY OF LARGO, FLORIDA,<br><br>Defendant | Civil Case No. 8:20-cv-1742 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Tampa Bay Waterkeeper ("TBWK"), Our Children's Earth Foundation ("OCE") and Suncoast Waterkeeper ("SCWK"), (collectively, "Plaintiffs"), by and through their counsel, hereby allege as follows:

### I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq.  ("Clean Water Act" or "CWA") (see 33 U.S.C. § 1365).  This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

1

2.     On May 29, 2020, Plaintiffs issued a sixty (60) day notice letter ("Notice Letter") to the City of Largo ("Defendant" or the "City").  The Notice Letter informed the City of its violations of the Clean Water Act and of Plaintiffs' intention to file suit against the City.  The Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IV, and the Secretary of the Florida Department of Environmental Protection ("FDEP") as required by Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter was also sent to the Executive Director of the Southwest Florida Water Management District ("Regional District").

3.     More than sixty (60) days have passed since the Notice Letter was issued to the City and the state and federal agencies.

4.     Plaintiffs are informed and believe, and thereon allege, that neither EPA nor the state of Florida has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint under Section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B).  This action is not barred by any prior administrative penalty matter issued under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).  Accordingly, because the requirements of 33 U.S.C. § 1365(b)(1)(B) have been met, this matter may be commenced.

5.     The venue is proper in the Middle District of Florida, Tampa Division, pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district, specifically within Pinellas County.

## II.   **INTRODUCTION**

6.      Plaintiffs allege the following violations of the Clean Water Act: (1) violations of the *State of Florida Domestic Wastewater Facility Permit* National Pollutant Discharge Elimination System ("NPDES") Permit No. FL0026603 ("NPDES Permit") (Causes of Action One and Four); (2) discharges of pollutants to waters of the United States without an NPDES Permit authorization in violation of Section 301(a) of the Clean Water Act 33 U.S.C. §1311(a) (Cause of Action Two); and (3) violations of the *State of Florida Municipal Separate Storm Sewer System Permit,* NPDES Permit Nos. FLS000005-003 and FLS000005-004 (collectively, "MS4 Permits") (Cause of Action Three).  The City's violations of the Clean Water Act, its MS4 Permits and its NPDES Permit are ongoing and continuous.

## III.   **PARTIES AND BACKGROUND**

### A.  Plaintiffs

#### 1.  Tampa Bay Waterkeeper

7.      TBWK is a Florida non-profit public benefit corporation with members throughout Tampa Bay, including Pinellas County.  TBWK is dedicated to protecting and improving the Tampa Bay watershed while ensuring swimmable, drinkable and fishable water for all.  TBWK's approach combines sound science, policy advocacy, grassroots community engagement and education to stand up for clean water together as a community, ensuring a clean and vibrant future for the Tampa Bay watershed.  To further its mission, TBWK actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its

members.  TBWK is based in Pinellas County and has been registered as a non-profit corporation in Florida since 2017.  TBWK is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 300 separate Waterkeeper programs, such as TBWK.

8.     TBWK represents its members in and around Pinellas County who have personally suffered harm to their aesthetic, recreational, and employment-related interests due to the City's illegal discharges of wastewater effluent into Old Tampa Bay in violation of the City's NPDES Permit limits and the City's sanitary sewer overflows ("SSOs") (*i.e.*, the unauthorized discharge of raw sewage, partially treated sewage, or treated reclaimed water) into Old Tampa Bay, Cross Bayou, Lake Seminole, Mckay Creek, Seminole Bypass Canal, Clearwater Harbor, Allen Creek, Church Creek, Rattlesnake Creek, Long Bayou, Boca Ciega Bay, Tampa Bay, the Gulf of Mexico, and other water bodies, streams, or tributaries in or adjoining the City (collectively, "Receiving Waters"), which are all waters of the United States.  TBWK members use those waters for boating, fishing, wading, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

9.     TBWK members include residents of Largo and Pinellas County who reside in the vicinity of the waters directly impacted by the City's violations and who have reasonably founded fears that the pollutants contained in the City's SSOs, the excessive nutrient loading to Old Tampa Bay in violation of the City's NPDES Permit effluent limits, and the City's exceedances of other NPDES Permit limitations have and

will continue to contribute to poor water quality in the Receiving Waters that may be dangerous to human health and the environment.  TBWK members also include: (1) residents of the communities that border Tampa Bay who have reasonably founded fears that the excessive nitrogen contained in the City's discharges of raw, partially treated and/or treated reclaimed water cause or exacerbate harmful algal blooms ("HABs") and the decline in abundance and distribution of seagrasses, both of which negatively impact the entire estuary; (2) commercial and charter fishermen who depend upon the ecological health of Tampa Bay for their livelihood, individuals who own and operate businesses in the tourism and marine service industries located within Pinellas County, whose businesses are adversely impacted by the City's illegal discharges and by public perception of poor water quality in Pinellas County; and (3) individuals who devote their time to Tampa Bay cleanup efforts, restoration of seagrass, and participation in wildlife patrols during nesting or hatching season.  TBWK members conduct nature surveys and studies, and photograph wildlife in and around affected waterways.  TBWK members contact the affected waters directly when they perform maintenance work on boats, participate in body-contact water sports, or participate in organized trash cleanups and seagrass restoration work along the shoreline.

### 2.  Our Children's Earth Foundation

10.    OCE is a non-profit public benefit corporation with members throughout the United States, including Tampa Bay and specifically, Pinellas County.  OCE's mission is to promote public awareness of domestic and international human rights issues and environmental impacts through education, art, and private enforcement actions for

the benefit of children and other populations who are the most vulnerable to pollution. OCE seeks to prevent environmental damage wherever possible and ensure that appropriate environmental protection statutes are being followed.  Throughout its 20-year history, OCE has regularly initiated environmental enforcement actions on behalf of itself and its members.  OCE has been registered as a non-profit corporation in Florida since 2016.

11.     Since 2016, OCE has focused on its environmental enforcement activities related to water quality in Florida.  OCE members in Pinellas County have repeatedly requested that OCE take legal action to effectively address water pollution problems in their communities, as well as sources of pollution that exacerbate HABs.  OCE members have expressed concern and fear regarding their exposure to raw and partially-treated sewage pollution, as well as the impacts of nutrient pollution to waters in Tampa Bay, including to the Receiving Waters.

12.     OCE members have expressed frustration that local and state officials have failed to adequately address the City's polluting of the Receiving Waters, despite recurring HABs and raw and partially-treated sewage releases that impact members' businesses, recreational activities, and quality of life.

13.     OCE members in and around Pinellas County have personally suffered harm to their aesthetic, recreational, and employment-related interests due to City's unauthorized discharges of raw or inadequately treated sewage and/or reclaimed water into the Receiving Waters.  Members of OCE use those waters to regularly participate in

boating, fishing, wading, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

### 3.  Suncoast Waterkeeper

14.     SCWK is a Florida non-profit public benefit corporation with members throughout Southwest Florida, including Pinellas County.  SCWK is dedicated to protecting and restoring the Florida Suncoast's waterways through fieldwork, advocacy, environmental education, and enforcement, for the benefit of the communities and SCWK's members who rely upon these precious coastal resources.  SCWK aims to protect local waterways for use for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation.  To further its mission, SCWK actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.  Pinellas County waterways and communities are included in SCWK's area of operation.  SCWK has been registered as a non-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time.  Like TBWK, SCWK is a licensed member of Waterkeeper Alliance, Inc.

15.     SCWK represents its members in and around Largo and Pinellas County who have personally suffered harm to their aesthetic, recreational, and employment-related interests due to the City's illegal discharges of wastewater effluent into Old Tampa Bay in violation of the City's NPDES Permit limits and the City's SSOs into the Receiving Waters.   SCWK members enjoy those waters for boating, fishing, wading,

body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

16.     SCWK members include residents of Largo and Pinellas County who reside in the vicinity of the waters affected by the City's violations and who have reasonably founded fears that the pollutants contained in the City's SSOs, the excessive nutrient loading to Old Tampa Bay in violation of the City's NPDES Permit effluent limits, and the City's exceedances of other NPDES Permit limitations have and will continue to contribute to poor water quality in the Receiving Waters that may be dangerous to them and human health and the environment.  SCWK members also include: (1) residents of the communities that border Tampa Bay who have reasonably founded fears that the excessive nitrogen contained in the City's discharges of raw, partially treated and/or treated reclaimed water cause or exacerbate HABs and the decline in abundance and distribution of seagrasses, both of which negatively impact the entire estuary; (2) commercial and charter fishermen who depend upon the ecological health of Tampa Bay for their livelihood, individuals who own and operate businesses in the tourism and marine service industries located within Pinellas County, whose businesses are adversely impacted by the City's illegal discharges and by public perception of poor water quality in Pinellas County; and (3) individuals who devote their time to Tampa Bay cleanup efforts, restoration of seagrass, and participation in wildlife patrols during nesting or hatching season.  SCWK members conduct nature surveys and studies, and photograph wildlife in and around the affected waterways.  SCWK members contact the affected waters directly when they perform maintenance work on boats, participate in

body-contact water sports, or participate in organized trash cleanups and seagrass restoration work along the shoreline.

17.     The City's illegal discharges of pollutants degrade water quality and harm aquatic life in the Receiving Waters, and thus threaten or impair each of the uses described above or contribute to such threats and impairments, ultimately impairing Plaintiffs' members' use and enjoyment of these waters.

18.     The City's illegal discharges of pollutants threaten or impair each of the uses described above or contribute to such threats and impairments.  Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by the City's failure to comply with its NPDES and MS4 Permits and the Clean Water Act. The relief sought herein will redress the harms to Plaintiffs' members caused by the City's illegal conduct.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate remedy at law.

19.     Plaintiffs bring this action on behalf of their members to address and remedy the injuries in fact suffered by these members as a result of the City's illegal discharges described above.  The interests of Plaintiffs' members at stake are germane to the purposes for which TBWK, OCE, and SCWK have been created.  Plaintiffs' organizational purposes all include protecting surface waters from pollution and degradation to promote their members' and the public's abilities to use surface waters for

water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation.

**B. Defendant**

20.    The City is a municipality incorporated under the laws of the state of Florida and a person within the meaning of Section 403.031(5), Fla. Stat., and Section 502(5) of the Clean Water Act. 33 U.S.C. § 1262(5).

21.    The City is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

**1. The City's Sewage Collection and Treatment System**

22.    The City holds NPDES Permit No. FL0026603, issued by FDEP for the Largo Wastewater Treatment Facility ("WWTF" or "Largo WWTF").

23.    The City owns and operates the Largo WWTF, and appurtenant sewage wastewater collection and treatment system ("WCTS") which collectively constitute a publicly owned treatment works ("POTW") as defined in Section 212(2) of the CWA, 33 U.S.C. § 1292(2), and 40 C.F.R. Section 125.58(s).  The POTW collects and treats sanitary sewage from the City's residents and businesses.

24.    All wastewater collected within Largo is transported to the WWTF through the WCTS.  The WWTF is located at 5100 150th Ave N, Clearwater, FL 33760 in Pinellas County.  It is an 18.0 million gallons per day ("MGD") annual average daily flow ("AADF") Type I domestic advanced wastewater treatment facility, using a high-rate three-stage biological nutrient removal process, commonly referred to as the A20 Process.  The treated wastewater effluent from the WWTF is either (1) distributed to a

"Master Reuse System" for land application within the City, the Carillon area and within the City of St. Petersburg, or (2) discharged through an outfall to the stormwater system within Feather Sound and thence to Tampa Bay.

25.     The point of discharge of effluent from the Largo WWTF is Surface Water Discharge D-001, which is a 30" diameter, reinforced concrete pipe that discharges effluent from the WWTF as described in the NPDES Permit: "An existing 15.0 MGD [AADF] discharge to an unnamed ditch, that is part of the stormwater system within Feather Sound, into the Class III Fresh waters of Roosevelt Basin, WBID 1624A. Roosevelt Basin flows into WBID1558H, Class II Marine waters of Old Tampa Bay, at Discharge Location D-001, which is at a depth of approximately 2 feet.  The point of discharge is located approximately at latitude 27°53' 52" N, longitude 82°40' 13" W."

26.     The City owns and operates the WCTS which consists of 294 public miles of collection and transmission lines, including 240 miles of gravity pipes, 30 miles of force mains, 21 miles of interceptor pipes, and 3 miles of discharge effluent lines.  There are 52 wastewater lift stations throughout the wastewater collection system and over 5,400 manholes.  The City is also responsible for the lower portion of lateral lines from the City's mainline connection to the property line.  Additionally, there are over 300 private collection systems consisting of all the assets commonly found in a sanitary sewer collection system, including lateral and main pipes, manholes, and 164 pump stations; these private systems are conveyed to the Largo WWTF.

11

### 2.  The City's Municipal Separate Storm Sewer System

27.    The City's municipal separate storm sewer system ("MS4") contains numerous storm drain inlets that lead to underground storm drain pipes, which discharge into the Receiving Waters.  The portion of the MS4 within the City's political boundaries serves the areas also served by the WCTS.

28.    The City is the owner and operator of the portions of the MS4 within its political boundaries under MS4 Permit Nos. FLS000005-03 and FLS000005-04.

### C.  The Local Waterways that Receive the City's Illegal Discharges and the Environmental Impacts from those Discharges

29.    The WWTF and WCTS are located in watersheds that drain to the Receiving Waters.  The storm pipes in the MS4 owned and operated by the City also discharge into these waters.

30.    SSOs from the WWTF and WCTS, as well as SSOs that enter the MS4 from the WWTF and WCTS and/or from privately-owned lateral lines, are discharged to the Receiving Waters.

31.    Effluent discharged from Surface Water Discharge D-001 flow directly through the stormwater system within Feather Sound and then to Old Tampa Bay.

32.    The Receiving Waters are waters of the United States, and/or have a significant nexus to waters of the United States, and thus are navigable waters as defined by the Clean Water Act and controlling authority.

33.    Tampa Bay is the largest open-water estuary in Florida, encompassing nearly 400 square miles, including numerous smaller bays and waterways and bordering three counties—Hillsborough, Manatee and Pinellas.  Tampa Bay's watershed covers a

land area of 2,200 square miles.  Tampa Bay is an ecologically sensitive water body and a defining feature of Southwest Florida.  Tampa Bay is an important and heavily used resource, with special aesthetic and recreational significance for people living in the surrounding communities.  The Tampa Bay shoreline has numerous highly valued beaches and points of public access that offer unique recreation opportunities for swimmers, kayakers, paddleboarders, windsurfers, sport fishers, and other recreational users.  Included amongst Tampa Bay's prized resources are specially recognized and protected waterways, such as the Boca Ciega Bay Aquatic Preserve and the Pinellas County Aquatic Preserve.  The Boca Ciega Bay Aquatic Preserve runs along the southwest coastline of the county and the remainder of the sovereign submerged lands in Pinellas County, including those in and around the City, comprise the Pinellas County Aquatic Preserve.  These two Aquatic Preserves are designated as "Outstanding Florida Waters," pursuant to 62-302.400 F.A.C., and are afforded special significant protection because of their natural attributes.

34.     SSOs harm the Receiving Waters and pose a serious risk to fisheries, wildlife habitat, and human health.  SSOs contain human waste, viruses, protozoa, mold spores and bacteria that are known pathogens that cause disease in humans and wildlife.  SSOs also contain chemicals that cause cancer or reproductive toxicity in humans and wildlife.  These chemicals come from solvents, detergents, cleansers, inks, pesticides, paints, pharmaceuticals, and other chemicals used by households and businesses and then discarded to sewage collection systems.

35.     SSOs further contain nutrients that increase the frequency, severity and duration of HABs that are toxic to humans, fish, shellfish, marine mammals and birds and are linked to a variety of illnesses in people and animals.  HABs in Tampa Bay and nearshore Gulf of Mexico waters have been manifested by massive fish kills, benthic invertebrate die offs and unusually high unusually high mortality rates of sea turtles and marine mammals.

36.     HABs in Tampa Bay include the toxic phytoplankton species *Pyrodinium bahamense, Pseudo-nitzschia, dinoflagellate Karlodinium* and likely contribute to Red Tide (*Karenia Brevis*) blooms.  Toxins found in HABs, including the potent saxitoxin found in *Pyrodinium bahamense*, are responsible for acute human illness and linked to neurodegenerative illness such as Amyotrophic Lateral Sclerosis and Parkinson's disease.

37.     *Pyrodinium bahamense* persists in Old Tampa Bay, which directly receives the City's effluent from Surface Water Discharge D-001.  *Pyrodinium bahamense* contributes to a large magnitude chlorophyll-a exceedance of FDEP regulatory criteria for chlorophyll-a concentrations that has persisted for at least the last five years. (2019 Tampa Bay Water Quality Assessment. 2020. Technical Report #01-20 of the Tampa Bay Estuary Program. Prepared by the Tampa Bay Estuary Program (M. Beck, M. Burke & G. Raulerson)).  The Florida Fish and Wildlife Research Institute's HAB group is monitoring and studying HABs in Old Tampa Bay.

38.     Besides the direct water and airborne pathways of toxic exposure to humans and wildlife, impacts secondary to fishkills can include skin and respiratory irritation in sensitive members of the human population.  The fish kills associated with

HABs can cause eyesores and noxious odor conditions associated with dead and decaying fish, making waters unfit for recreational use, aesthetic enjoyment, or spiritual contemplation.

39. SSOs that discharge into the Receiving Waters result in the addition of the pollutants described above (*i.e.*, pathogens, nutrients, chemicals, and various toxins). The intensive use of the Receiving Waters for commercial and sport fishing, shellfish harvesting, and water-contact recreation increases the likelihood that people will come into direct contact with SSOs and the pollutants they contain. SSOs also affect people who eat fish and bivalves caught and harvested in these waters. Toxic chemicals and neurotoxins bio-accumulate in the affected waters' food webs; *i.e.*, contaminants absorbed by plankton accumulate in fish and birds farther up the food chain, and ultimately transfer in higher doses to human consumers.

40. Old Tampa Bay, which directly receives the discharge of the City's effluent from Surface Water Discharge D-001, is suffering from excessive pollution and is designated as an impaired water body. A water body that is designated as impaired cannot support its designated beneficial uses. The beneficial uses of Old Tampa Bay include recreation, and propagation and maintenance of a healthy, well balanced population of fish and wildlife. Portions of Old Tampa Bay are designated to support shellfish propagation or harvesting. Numerous segments of Old Tampa Bay are listed on the State of Florida's Statewide Comprehensive Verified List of Impaired Waters ("State List") and submitted to the Environmental Protection Agency for inclusion in the CWA

Section 303(d) list of impaired water bodies ("Federal List") as impaired by Bacteria (in several different forms), Biochemical Oxygen Demand and Nutrients.

41.     Tampa Bay, and in particular Old Tampa Bay, has a significant nitrogen pollution problem.  Between 1950 and 1988, an estimated 42% of the seagrass acreage in Tampa Bay was lost primarily through excess nitrogen loading and related increases in phytoplankton concentrations, causing light limitation for seagrass survival and growth. Since the late 1980s, Tampa Bay has seen significant recovery of seagrass population through substantial financial investments.  Seagrasses are an essential part of the estuarine ecosystem as they provide food and habitat for aquatic animals, filter water, reduce erosion, and anchor sediment.  Additionally, juvenile survival rates are much higher for fish and other marine life in areas where seagrasses have been maintained and restored.  However, Old Tampa Bay, particularly Feather Sound, where the City of Largo discharges its treated effluent, has seen poor recovery and decline in its seagrass acreage in recent years relative to the rest of the Tampa Bay estuary.  SSOs and in particular the nutrients contained within the City's discharges contribute to the decline in abundance and distribution of seagrasses in Old Tampa Bay and impair seagrass recovery in the broader Tampa Bay estuary.

42.     The City's persistent NPDES Permit exceedances for TN has likely been a major contributor to persistent HABs in Old Tampa Bay and related chlorophyll-A exceedances, and helps explain the failure to attain the FDEP-established thresholds for chlorophyll-A in 2015, 2017, and 2019 set forth in the Tampa Bay Estuary Reasonable Assurance Plan ("RAP").  The RAP was developed by the Tampa Bay Estuary Program

(TBEP) and members of the Tampa Bay Nitrogen Management Consortium in cooperation with EPA, DEP and other Tampa Bay regional stakeholders.  FDEP approved the RAP on December 10, 2010, under Section 403.067, F.S., and 62-303.600 (F.A.C.), consistent with Section 303(d) of the Clean Water Act.

43.     High levels of Nitrogen in the effluent from the City's Surface Water Discharge D-001 is a significant contributor to poor water quality, HABs, and seagrass declines.  The City's failure to meet its permit requirements fetters the collaborative efforts of stakeholders throughout the region towards seagrass recovery and water quality improvement.

44.     The Cross Bayou Canal is impaired for dissolved oxygen, enterococci, mercury, nutrients (chlorophyll-A), and TN and is included in the State List and Federal List for impaired waters regarding those pollutants.  The water quality of Cross Bayou Canal does not support its designated beneficial uses, including recreation, propagation, and maintenance of a healthy, well balanced population of fish and wildlife.  Cross Bayou Canal connects Old Tampa Bay to Long Bayou, which is on the State List and Federal List as impaired for fecal coliform and mercury, and unable to support its designated beneficial uses.  Long Bayou connects to and subsequently flows into Boca Ciega Bay, Tampa Bay and the Gulf of Mexico.

45.     By illegally discharging SSOs (*i.e.*, the unauthorized discharge of raw sewage, partially treated sewage, or treated reclaimed water), into the MS4, Old Tampa Bay, Cross Bayou, Lake Seminole, Mckay Creek, Seminole Bypass Canal, Clearwater Harbor, Allen Creek, Church Creek, Rattlesnake Creek, Long Bayou, Boca Ciega Bay,

Tampa Bay, the Gulf of Mexico in or adjoining Largo and Pinellas County, and by persistently exceeding its NPDES Permit effluent limits for discharges into Old Tampa Bay, the City contributes to the continuing impairment of these waters.  As such, the City's violations of the Clean Water Act directly harm Plaintiffs' members' use and enjoyment of the above mentioned waters by: (1) loading these waters with pathogens and thus leading these members to have well-founded fears that engaging in water contact recreation in these waters has risked or would risk making them or their family members ill, (2) loading these waters with nutrients that have likely exacerbated HABs, fish kills, and conditions noxious to these members' use and enjoyment of these waters and/or that have led these members to have well-founded fears of the worsening of HABs in these waters, (3) loading these waters with various toxic chemicals leading these members to have well-founded fears that they would be harmed if they engaged in water contact recreation or fishing in these waters, and (4) loading these waters with various toxic chemicals leading these members to have well-founded fears that wildlife they enjoy viewing is at risk of harm due to contamination of these waters.

46.     Members of the Plaintiff organizations have suffered injuries in fact caused by the City's illegal discharges and NPDES Permit violations because the City's illegal discharges of raw and partially treated sewage, and treated effluent to Receiving Waters have reached and directly contaminated waters that Plaintiffs' members use for body-contact water sports, fishing, boating, and other activities, causing Plaintiffs' members to lessen the frequency and enjoyment of their activities in and around the affected waters.

## IV.   STATUTORY AND LEGAL REQUIREMENTS

### A.  The Clean Water Act

47.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of a pollutant by any person to waters of the United States, except, *inter alia,* in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

48.    Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, *inter alia,* sewage, sewage sludge, biological material and industrial, municipal and agricultural waste.

49.    Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

50.    Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well [or] discrete fissure."

51.    Section 402 of the CWA, 33 U.S.C. § 1342, provides that the permit-issuing authority may issue an NPDES permit that authorizes the discharge of any pollutant to waters of the United States, upon the condition that such discharge will meet all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

52.    The State of Florida has been authorized by EPA to issue NPDES permits.

53.     Pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, and Chapter 403, Florida Statutes (F.S.) and applicable rules of the Florida Administrative Code (F.A.C.), FDEP issued NPDES Permit No. FL0026603 to the City.

54.     The City is required to comply with its NPDES Permit with respect to discharges from the POTW or its collection system, and the manner in which it operates and maintains the POTW.

55.     Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), requires an NPDES permit for municipal stormwater discharges.  The stormwater element of the federal NPDES Program is mandated by Section 402(p), 33 U.S.C. § 1342(p), and implemented through federal regulations, including 40 C.F.R. Section 122.26.  EPA has approved the FDEP to administer the stormwater NPDES permit program in Florida. FDEP is authorized under Section 403.0885 of the Florida Statutes (F.S.) and Rule 62-624 of the Florida Administrative Code (F.A.C.) to implement the stormwater NPDES Program.

56.     An MS4 is defined as "a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains)" owned or operated by a state, city, or town that is designed or used for collecting or conveying storm water and that discharges to waters of the United States.  *See* 40 C.F.R. §§ 122.26(b)(8)(i)–(iv); *see also* 40 C.F.R. § 122.26(b)(18).

57.     As part of the stormwater program, FDEP has determined that an MS4 permit is required for the operation of the Pinellas County's stormwater systems.

Pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, and Chapter 403, Florida Statutes (F.S.) and applicable rules of the Florida Administrative Code (F.A.C.), FDEP issued MS4 Permit No. FLS000005-004 for Pinellas County with an issuance date of July 1, 2018 and expiration date of June 30, 2023.  The previous MS4 Permit (MS4 Permit No. FLS000005-003) was issued effective January 1, 2013 with an expiration date of December 31, 2017.

58.     The City is responsible for operating and maintaining the MS4 within its political boundaries, tasks which include, but are not limited to, preventing the discharge of non-stormwater (i.e., any substances other than stormwater including but not limited to sewage or re-use water) into the MS4.

59.     Any violation of the NPDES Permit or the MS4 Permits is a violation of the Clean Water Act.  *See* 40 C.F.R. § 122.41(a) (2001).

60.     Any unauthorized discharge of a pollutant is a violation of the Clean Water Act under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

61.     Section 505(a) of the Clean Water Act provides for citizen enforcement actions against any "person," for violations of (1) any effluent standard or limitation or (2) an order issued by the Administrator or a State with respect to such a standard or limitation.  *See* 33 U.S.C. §§ 1365(a), 1365(f), 1362(5).

62.     Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), authorizes an action for injunctive relief. Each separate violation of the Clean Water Act subjects the violator to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least July 28, 2015

21

to the present. Civil penalties for violations of the Clean Water Act subject the violator to a penalty of up to $55,800 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring before November 2, 2015. 40 C.F.R. § 19.4 (effective Jan. 13, 2020).

63.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits the prevailing or substantially prevailing parties to recover litigation costs, including attorneys' and experts' fees.

## V.     GENERAL ALLEGATIONS

### A.  The City's NPDES Permit

64.     On October 26, 2012, FDEP renewed NPDES Domestic Wastewater Facility Permit No. FL0026603 for the City's WWTF (Permit No. FL0026603-007-DW1/NR). FDEP renewed the 2012 Permit on February 26, 2019 (Permit No. FL0026603-013-DW1/NR). The NPDES Permit authorizes the City to discharge effluent from the outfall identified as Surface Water Discharge D-001 in accordance with effluent limitations, monitoring requirements, and other provisions as set forth in the Permit.

65.     Surface Water Discharge D-001 is a "point source" within the meaning of Section 502(14) of the Clean Water Act. 33 U.S.C. § 1362(14).

66.     The WCTS consists of pipes and other manmade conveyances, and constitutes a point source under Section 502(14) the Clean Water Act, 33 U.S.C. § 1362(14).

67.     The City is responsible for operating and maintaining the POTW, tasks which include, but are not limited to: properly collecting and conveying sewage through

the WCTS, proper treatment at the WWTF, conducting routine maintenance, cleaning, and inspection of the WCTS and WWTF, and responding to citizens' complaints regarding discharges of raw and/or partially treated sewage.

68.     The City has persistently failed to properly operate and maintain its POTW, resulting in the effluent violations described above.  Specifically, overflows of raw sewage come from the City's sewer lines, manholes, pump stations, and various other POTW equipment/conveyances that are part of the WCTS and the WWTF, spills and unauthorized discharges of partially treated sewage come from the WWTF, and spills and unauthorized discharges of treated reclaimed water come from the WWTF.

69.     Since at least April 2019, the City has continuously discharged effluent containing TN and dichlorobromomethane in exceedance of the effluent limits in the NPDES Permit from Surface Water Discharge D-001 into Old Tampa Bay and/or adjoining waterways, as set forth on Exhibit 1.

70.     Since at least July 28, 2015, the City has discharged effluent from Surface Water Discharge D-001 into Old Tampa Bay and/or adjoining waterways, in violation of the fecal coliform detection effluent limit contained in the NPDES Permit, as set forth on Exhibit 1.

71.     TN, dichlorobromomethane, and fecal coliform are pollutants within the meaning of Section 502(6) of the Clean Water Act. 33 U.S.C. § 1362(6).  These harmful pollutants result in the addition of pathogens, nutrients, and various toxic chemicals to the Receiving Waters.

72.     The City's unlawful discharges of pollutants into navigable waters of the

United States from a point source it controls, as alleged above, have increased in duration

and volume over time, with the knowledge of the City and with no adequate measures

taken to prevent or cease these discharges.

73.     The City's volume and content of NPDES Permit violations alleged herein

are reported in numerous documents, including, without limitation, the FDEP "Public

Notices of Pollution" containing information submitted by the City, the City's Discharge

Monitoring Reports ("DMRs") to FDEP under the NPDES Permit, the City's reports of

SSOs and unauthorized discharge events to FDEP, the City's report to Florida's State

Watch Office, the City's correspondence with FDEP, FDEP documents relating to the

City's NPDES Permit, and in consent orders and amendments between the City and

FDEP.

## B.  Sanitary Sewer Overflows

74.     The City has reported numerous unauthorized overflows and discharges of

raw and/or partially treated sewage from its WWTF and WCTS, including but not limited

to sewer lines, manholes, pump stations, and various other POTW

equipment/conveyances that are part of the overall collection system, and reclaimed

water from its Master Reuse System since July 28, 2015.  These overflows and

discharges are referred to as sanitary sewer overflows ("SSOs").  The City's SSOs are

documented in FDEP "Public Notices of Pollution" containing information submitted by

the City, the City's reports of SSOs and unauthorized discharge events to FDEP, the

City's report to Florida's State Watch Office, the City's correspondence with FDEP, and FDEP documents relating to the Largo WWTF and WCTS.

75. The City has discharged and continues to discharge SSOs from the WWTF and WCTS to waters of the United States, and/or into its MS4 that then discharges to waters of the United States, without NPDES permit coverage, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) and the MS4 Permits.

76. Of the SSOs from the WWTF and WCTS that have occurred since July 28, 2015, the City has reported that many have discharged to surface waters and/or into the MS4 owned and operated by the City.

77. SSOs from the WWTF and WCTS to waters of the United States, as well as SSOs that enter the City's MS4 from the WCTS and/or from privately-owned lateral lines, are discharged to the Receiving Waters, and/or to the MS4 that then discharges to waters of the United States.

78. The City has failed to act to eliminate its violations of the Clean Water Act.  Specifically, the City has failed to adequately operate, maintain, repair, replace, and/or update the WWTF and WCTS, thus resulting in SSOs.

79. The City has reported that a major source of the City's SSOs is wet weather spills caused by the inadequate capacity of the WCTS and the WWTF to handle peak wet weather flows.  Flows through the WCTS increase considerably during wet weather due to the infiltration and inflow of storm water and groundwater into sewer pipes, thus overwhelming the capacity of the WCTS and the WWTF causing SSOs.

25

80.     The City has reported that many of the SSOs from the WCTS are the result of broken sewer lines, pump station equipment and force-main failures; undersized sewer lines or pump station pumping and/or storage capacity; and unaddressed defects in sewer lines such as extensive line cracking, sags in lines, and misaligned joints.

81.     The City has reported that many of the SSOs from the WCTS are dry weather spills caused by fats, oil and grease in sewer lines, and blockages caused by roots and debris.

82.      SSOs from the WWTF and WCTS are also caused by the deterioration of sewage infrastructure, under-funding of repairs, and mismanagement.

83.     The City's WWTF and WCTS are deteriorating, and deferral of repairs allows the continued discharge of SSOs to waters of the United States in violation of the Clean Water Act.

84.     The City's volume and content of SSOs alleged herein are reported in numerous documents, including, without limitation, the FDEP "Public Notices of Pollution" containing information submitted by the City, the City's reports of SSOs and unauthorized discharge events to FDEP, the City's report to Florida's State Watch Office, the City's correspondence with FDEP, FDEP documents relating to the City's NPDES Permit, and in consent orders and amendments between the City and FDEP.

**C.  The MS4 Permits**

85.     FDEP issued the MS4 Permits, No. FLS000005-003 in 2013 and MS4 Permit No. FLS000005-004 in 2018.

86.     The MS4 Permits authorize the City to discharge stormwater to waters of the State in accordance with the approved Stormwater Management Program, effluent limitations, monitoring requirements, and other provisions as set forth in the permit.

87.     The MS4 Permits contain prohibitions and limitations on the discharge of non-stormwater and/or pollutants into the MS4.

88.     Part I.A of the MS4 Permits establishes that the City owns and operates the portions of the Pinellas County MS4 within its political boundaries.

89.     The MS4 owned and operated by the City is a point source under Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

90.     The MS4 Permits define "Stormwater" as "stormwater runoff, surface runoff and drainage." MS4 Permit No. Number FLS000005-003 at Part X.J and MS4 Permit No. FLS000005-004 at Part X.L.

91.     Part I.D of the MS4 Permits require that the City effectively prohibit the discharge of non-stormwater into the MS4.

92.     Part II.A.7.d. of the MS4 Permits require that the City implement procedures to prevent, contain, and respond to spills that may discharge into the MS4.

93.     The MS4 Permits require that the City "take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment." No. Number FLS000005-003 at Part IX.E and MS4 Permit No. FLS000005-004 at Part IX.5.

94.     As owner and operator of the MS4, the City is responsible for violations of the Clean Water Act alleged herein related to discharges of sewage into or from the MS4.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Permit Effluent Violations at Surface Water Discharge D-001

95.     Paragraphs 1 through 94 are realleged and incorporated by reference herein.

96.     During the period relevant to this Complaint, the City has discharged and likely will continue to discharge effluent from Surface Water Discharge D-001 containing pollutants in excess of effluent limitations and detection limitations in the NPDES Permit into Feather Sound and Old Tampa Bay, which are waters of the United States.

97.     The City has exceeded the effluent limits in its NPDES Permit for TN and dichlorobromomethane for fifteen (15) consecutive months prior to the filing of this Complaint, and for fecal coliform detection limits for a total of 25 months since July 28, 2015.   Exhibit 1 identifies the exceedances of effluent limits in the City's NPDES Permit at Surface Water Discharge D-001.

98.     Significantly more violations of the NPDES Permit will likely be discovered through this enforcement action.  Each such additional NPDES Permit violation is a separate violation of the NPDES Permit and the Clean Water Act.

99.     For each exceedance of an effluent limitation, the City is in violation of Section 301 of the CWA, 33 U.S.C. § 1311, for discharging in violation of the conditions

and limitations of the applicable NPDES Permit under Section 402 of the CWA, 33 U.S.C. § 1342.

100.    The City's violations of its NPDES Permit effluent limitations, in violation of the Clean Water Act, are ongoing and continuous.

101.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least July 28, 2015 to the present.

102.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

103.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the public for which harm they have no other plain, speedy, or adequate remedy at law.

## SECOND CAUSE OF ACTION
### Unpermitted Discharges
### in Violation of Section 301(a) of the Clean Water Act

104.    Paragraphs 1 through 103 are realleged and incorporated by reference herein.

105.    The City has discharged and continues to discharge SSOs from its WWTF and WCTS to waters of the United States, and/or into its MS4 that then discharges to waters of the United States, without NPDES permit coverage, on at least 252 separate occasions since July 28, 2015, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).  A partial list of these discharges is listed on Exhibit 2 attached to this

Complaint.  Plaintiffs will amend Exhibit 2 if further review indicates that additional SSOs have occurred.

106.    Of the SSOs from the WWTF and WCTS since July 28, 2015, most have discharged to surface waters and/or into the MS4 operated by the City.

107.    Each of the City's SSOs described above that has caused pollutants to flow into waters of the United States constitute a separate violation of Section 301(a) of the Clean Water Act.

108.    Significantly more discharges of sewage than those reported by the City will likely be discovered through this enforcement action.  Each such additional SSO discharge to waters of the United States is a separate Clean Water Act violation.

109.    The City's discharges of SSOs to waters of the United States, and/or that enter its MS4 that then discharge to waters of the United States, are ongoing and continuous.

110.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least July 28, 2015 to the present.

111.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

112.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the public for which harm they have no other plain, speedy, or adequate remedy at law.

**THIRD CAUSE OF ACTION**
**Sewage Discharges to the City's MS4,**
**in Violation of the MS4 Permits and Clean Water Act**

113.     Paragraphs 1 through 112 are realleged and incorporated by reference herein.

114.     Part I.D of the MS4 Permits requires the City to prohibit and prevent the introduction of non-stormwater into the MS4 system.  Raw sewage from sanitary sewage overflows is not within the definition of stormwater.  MS4 Permit No. Number FLS000005-003 at Part X.J and MS4 Permit No. FLS000005-004 at Part X.L.

115.     Additionally, Part II.A.7.d of the MS4 Permits requires the City to implement procedures to prevent, contain, and respond to spills that may discharge into the MS4.

116.     The City has discharged and continues to discharge SSOs from the WWTF and WCTS into its MS4 that then discharges to waters of the United States without NPDES permit coverage, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) and Part I.D of the MS4 Permits.

117.     The City's sanitary sewer overflows that discharge to its MS4 represents the City's direct failure to prevent the comingling of stormwater and sewage and is a violation of Parts I.D and II.A.7.d of the MS4 Permits.

118.     Each day of discharge by the City of non-stormwater in violation of the MS4 Permit is a separate and distinct violation of the Clean Water Act.

119.    Significantly more SSOs of non-stormwater into the MS4 will likely be discovered through this enforcement action.  Each such additional failure is a separate violation of the MS4 Permits and the Clean Water Act.

120.    The City's discharges of non-stormwater into the MS4, in violation of the MS4 Permits and the Clean Water Act, are ongoing and continuous.

121.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least July 28, 2015 to the present.

122.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

123.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the public for which harm they have no other plain, speedy, or adequate remedy at law.

<u>**FOURTH CAUSE OF ACTION**</u>
**Failure to Properly Operate and Maintain the City's POTW Including the Collection System and all related Appurtenances, in Violation of Part IX.7 of the City's NPDES Permit**

124.    Paragraphs 1 through 123 are realleged and incorporated by reference herein.

125.    Part IX.7 of the City's NPDES Permit requires the City to properly operate and maintain the Largo WWTF and related appurtenances.

126.    The City has violated Part IX.7 of its NPDES Permits with numerous deficient operation and maintenance practices. The City's persistent and extensive Clean

Water Act violations result from and evince a failure to properly operate and maintain its POTW, including neglect and mismanagement of its WWTF and all related appurtenances.  The City has not taken the actions necessary to comply with the terms of its NPDES and MS4 Permits, which has led to hundreds of known violations.

127.    The City's sewage spills have resulted from a variety of poor or inadequate POTW system maintenance, operation, repair, replacement and rehabilitation practices.  These poor practices have led to sewer line blockages (generally caused by buildup of grease, accumulation of sediment and debris, and root intrusion), unaddressed defects in sewer lines such as extensive line cracking, sags in lines, and misaligned joints; broken sewer lines, pump station equipment failures, undersized sewer lines or pump station pumping and/or storage capacity, and the overwhelming of system capacity due to excessive infiltration and inflow of stormwater and groundwater during wet weather. The City has not corrected these operational or maintenance problems and the violations are continuing.

128.    Each day the City fails to properly operate and maintain its POTW is a separate and distinct violation of the Clean Water Act.

129.    The City's failure to properly operate and maintain its POTW is ongoing and continuous.

130.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least July 28, 2015 to the present.

131.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

132.    An action for injunctive relief under the Clean Water Act is authorized by

33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above

will irreparably harm Plaintiffs and the public for which harm they have no other plain,

speedy, or adequate remedy at law.

## VII.    <u>RELIEF REQUESTED</u>

133.    Plaintiffs respectfully request that this Court grant the following relief:

a.    Declare the City to have violated and to be in violation of Section

301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for its discharges of

Reclaimed Water and SSOs to waters of the United States without an NPDES

permit;

b.    Declare the City to have violated and to be in violation of the

Clean Water Act for discharging pollutants without complying with the

substantive and procedural requirements of the MS4 and NPDES Permits;

c.    Enjoin the City from discharging Reclaimed Water and SSOs to

waters of the United States without an NPDES permit, in violation of Section

301(a) of the Clean Water Act, 33 U.S.C. 1311(a);

d.    Enjoin the City from violating the substantive and procedural

requirements of the Clean Water Act and the MS4 and NPDES Permits;

e.    Assess civil penalties against the City of up to $37,500 per day per

violation for violations occurring on or before November 2, 2015, and $55,800

per day per violation for violations occurring after November 2, 2015.  40 C.F.R.

§ 19.4 (effective Jan. 13, 2020).

g.      Award Plaintiffs their reasonable costs of suit, including attorney,

witness, and consultant fees, as provided for under by Sections 309(d) and 505(a)

of the Clean Water Act, 33 U.S.C. §§ 1319(d) and 1365(a); and

h.      Any such other relief as the Court deems appropriate.


Dated: July 28, 2020                    /s/ Justin Bloom
                                        Trial Counsel
                                        Florida Bar #89109
                                        Justin Bloom Attorney at Law, PA
                                        P.O. Box 1028
                                        Sarasota, FL 34230
                                        Telephone: (941) 275-2922
                                        Facsimile: (866) 574-2169
                                        Email: bloomesq1@gmail.com

                                        /s/ Michael Goodstein
                                        Florida Bar #435295
                                        Van Ness Feldman, LLP
                                        1050 Thomas Jefferson St. NW
                                        Seventh Floor
                                        Washington, D.C. 20007
                                        Telephone: 202-298-1800
                                        Facsimile: 202-338-2416
                                        Email: mgoodstein@vnf.com

                                        *Attorneys for Plaintiffs TAMPA BAY
                                        WATERKEEPER, OUR
                                        CHILDREN'S EARTH
                                        FOUNDATION and SUNCOAST
                                        WATERKEEPER*